974 A.2d 1126 (2009)
408 N.J. Super. 331
Sanford THIGPEN, Plaintiff/Cross-Appellant, and
Francis Deherde, Plaintiff-Respondent, and
Fred Kearse and Frank Michetti, Plaintiffs,
v.
CITY OF EAST ORANGE, East Orange Board of Police Commissioners, East Orange Police Department, Defendants-Appellants/Cross-Respondents, and
Virginia M. Cross, William A. Garvin, and Norman Price, Defendants.
DOCKET NO. A-0456-07T2.
Superior Court of New Jersey, Appellate Division.
Submitted March 25, 2009.
Decided July 29, 2009.
*1127 Ruderman & Glickman, P.C., attorneys for appellants/cross-respondents (Steven S. Glickman, Springfield, of counsel and on the brief).
Eldridge Hawkins LLC, East Orange, attorney for respondent Francis DeHerde and cross-appellant Sanford Thigpen (Mr. Hawkins, on the brief).
Before Judges PAYNE, NEWMAN and ASHRAFI.
The opinion of the court was delivered by
PAYNE, J.A.D.
Defendants, City of East Orange, East Orange Board of Police Commissioners and East Orange Police Department, appeal from a final judgment awarding damages in the amount of $592,628 to plaintiff, Francis DeHerde, a retired East Orange police officer, for back salary and past and future pension benefits owed to him for alleged service as a de facto police sergeant or lieutenant, supervising the Traffic Unit of the Police Department. Defendants contend that the trial judge erred in finding, as a matter of law, that DeHerde had performed the duties of a de facto officer, and also in failing to limit DeHerde's damage award to back pay.
Plaintiff, Sanford Thigpen, a current East Orange police officer, and a recipient of a $10,000 jury verdict for economic damages sustained as the result of malicious prosecution, cross-appeals from the dismissal of his non-economic damages claims for malicious prosecution and invasion of privacy. He argues that the trial judge erred in finding that such damages were barred by the injury threshold of the Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 14-4. We reverse the verdict in favor of DeHerde and remand the matter for a new trial. We affirm as to Thigpen. Because there is no commonality between the claims of the two appellants, they will be treated separately in this opinion.

DeHerde
DeHerde joined the East Orange Police Department in 1980. In July 1987, he was assigned to its Traffic Unit, which consisted of four patrolmen and approximately seventy-six civilian crossing guards, under the supervision of a sergeant and a lieutenant. The Traffic Unit was one of several departmental units under the general authority of a day captain. Rules and regulations applicable to crossing guards, adopted in 1991, provided in section four:
A superior police officer, to be known as the Traffic Supervisor or Lieutenant of the Traffic Unit shall be assigned to supervise traffic guards. Such Officer shall operate under the direction of the Day Captain.
Although DeHerde's primary responsibility at the outset of his assignment had been to track radar, eventually he began assisting the sergeant, Alvin Hayes, in hiring and supervising the crossing guards and in scheduling off-duty officers to work traffic details and around construction zones. At some point in time, the lieutenant assigned to the Unit was reassigned elsewhere, Sgt. Hayes was promoted to the position of lieutenant and assumed the responsibilities of Traffic Unit Supervisor. The position of sergeant remained vacant, and its duties were incorporated into those of Hayes. In 1993, Hayes suffered two strokes, and remained absent from work until his retirement in March 1994.
According to the testimony of DeHerde, at some time after Hayes ceased his employment, DeHerde was informed by Chief of Police Harmon that "they're not going to replace Lieutenant [Hayes's] position. They want me to fill the position of Traffic Supervisor, to be in charge of the operation of the Traffic Unit, the crossing *1128 guards." However, no formal steps were undertaken in this regard, and neither DeHerde's compensation nor his rank changed.[1]
During the period from March 1994 until September 1995, no ranking officer was assigned to the Traffic Unit. From September 1995 to November 1996 and from November 1999 to October 2003, various sergeants were assigned to the Unit. Thereafter, and until DeHerde's retirement in September 2005, no sergeants were assigned. DeHerde was absent from work from November or December 2004 until his retirement as the result of surgery and periods of leave.
Prior to trial, the City of East Orange and the East Orange Police Department admitted the following:
30. Plaintiff was on July 1987 assigned to [the] Traffic Unit.
31. From July of 1987 until February of 1994 Lt. Alvin Hayes was plaintiff's supervisor. Plaintiff DeHerde's duties were working the street enforcing motor vehicle laws and later to assist Lt. Hayes in the supervision of 76 crossing guards, assist Lt. Hayes in assisting off duty Officers to work street construction and to insure the work zone[s] were correctly set up.
32. Lieutenant Hayes suffered two strokes. He was not replaced and missed about a year of work.
33. Plaintiff then became responsible for these duties.
34. Lieutenant Hayes retired in March of 1994 and he was not replaced until about September of 1995.
35. Plaintiff was still responsible for the supervision of school crossing guards, the hiring of the guards, off duty traffic details, work zones, the Drunk Driving Enforcement Patrols and maintaining the Traffic Unit.
Additionally, the City and the Police Department admitted that, during the period from September 1995 to November 1996, and from November 1999 to October 2003, when sergeants were assigned to the Traffic Unit, DeHerde's duties remained the same, except that he assisted the sergeants and that "[t]he only difference was the department wanted to have a Sergeant run the Traffic Unit."
DeHerde based his suit on an alleged violation of N.J.S.A. 40A:9-6, which provides:
Any person who has held or who may hereafter hold, de facto, any office or position in the public service of any county or municipality, and who has or shall have performed the duties thereof, shall be entitled to the emoluments and compensation appropriate to such office or position for the time in fact so held and may recover therefor in any court of competent jurisdiction, notwithstanding any refusal or failure of any other person or officer to approve or authorize the payment of said emoluments and compensation.
At the conclusion of the evidence, the trial judge ruled as follows:
As to ... former Officer DeHerde the admissions make it clear that at least for some point of time Officer DeHerde worked as a superior officer. It will be for the jury to decide when, for how long and at what superior officer level, and what effect this would have had on his pension.

*1129 Therefore, the only issue for the jury to decide is the amount.
In accordance with this ruling, the trial judge instructed the jury in the following terms:
In this lawsuit the plaintiff DeHerde has sued defendant East Orange for failing to compensate him for the time spent acting as a de facto sergeant and lieutenant.... [T]he law provides that any person who has held or who may hereafter hold de facto any office [or] position in the public service of any township or municipality and who has and so has performed the duties thereof shall be entitled to the emoluments and compensation appropriate to such office and position for the time, in fact, so held.
Plaintiff DeHerde has the burden of establishing by a preponderance of the evidence what level office he held in a de facto manner, whether sergeant or lieutenant and for what period of time. And whether he retired at the level of a superior officer.
* * *
Plaintiff DeHerde is seeking back salary and past and future pension benefits that he said he would have been given had he been compensated at the superior officer position that he states that he held.
The jury verdict sheet contained but one question with respect to DeHerde: "What amount of money will compensate plaintiff DeHerde for the work he did as a superior officer in the East Orange Police Department?" As stated, the jury returned a verdict of $592,628.
We reverse, because we conclude that the trial judge utilized an incorrect standard when determining as a matter of law that defendants were liable on DeHerde's claim that he served as a de facto officer and when instructing the jury on the necessary foundation for its damages award in that regard. We do so, because precedent establishes that proof that one has assumed the duties of a superior, in and of itself, is insufficient to warrant judgment on the statutory claim.
We cited the classic definition of a de facto officer in Jersey City v. Dept. of Civil Service, 57 N.J.Super. 13, 153 A.2d 757 (App.Div.1959), stating there:
In [State v.] Carroll, [38 Conn. 449 (Sup.Ct.Err. 1871)], Chief Justice Butler set out the following comprehensive definition of a de facto officer:
"An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised.
First, without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke the action, supposing him to be the officer he assumed to be.
Second, under color of a known and valid appointment or election, but where the officer had failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like.
Third, under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public.
Fourth, under color of an election or appointment by or pursuant to a public unconstitutional law, before the same is adjudged to be such." (38 Conn., at pages 471-472).

*1130 [Jersey City, supra, 57 N.J.Super. at 27, 153 A.2d 757.]
This standard remains the law of New Jersey. See, e.g., Matter of Fichner, 144 N.J. 459, 469, 677 A.2d 201 (1996); Rawitz v. County of Essex, 347 N.J.Super. 590, 594-95, 791 A.2d 314 (Law Div.2000), aff'd o.b., 347 N.J.Super. 570, 791 A.2d 226 (App.Div.), certif. denied, 172 N.J. 357, 798 A.2d 1270 (2002). Thus, under the first of Carroll's definitions, which is the only one potentially applicable in this case, DeHerde was required to prove that he "`held' the `office or position' on a de facto basis" and that, "while holding the position on that de facto basis, the claimant `performed the duties' of the position." Rawitz, supra, 347 N.J.Super. at 572, 791 A.2d 226.
In the present case, the trial judge concluded as a matter of law that DeHerde was a de facto officer by use only of the second aspect of Carroll's first definition: that he performed the duties of the position. We find that conclusion to have been mistaken. Further, following our review of the record, we cannot conclude independently that the first prong has been satisfied as a matter of law. DeHerde was required to prove that he held the position of Supervisor of the Traffic Unit, not just that he assumed duties formerly undertaken by Sergeant, then Lieutenant Hayes. The evidence is mixed on that point.
As we have stated, DeHerde himself testified that Chief of Police Harmon wanted DeHerde to fill the position of Traffic Unit Supervisor. There is no corroboration of that statement by Harmon, and there is evidence to suggest that it was incorrect, since evidence is unclear that DeHerde ever supervised the other patrol officers assigned to the Traffic Unit, which it is likely he would have been required to do as Traffic Unit Supervisor. Indeed, testimony in the record suggests that DeHerde would have been unable to supervise officers of a rank equivalent to his.
Further, although on direct examination, former Chief of Police Grimes[2] appeared to concede that DeHerde filled the position of Supervisor of the Traffic Unit, on cross-examination Grimes admitted that he did not know what job functions were assigned to DeHerde when sergeants were absent that were different from those that he performed as a patrol officer. Grimes was asked: "So even though a sergeant was not present the job functions performed by Officer DeHerde to your knowledge were job functions that fell within the job description of patrolman?" Grimes responded: "As far as I know, sir."
As a final matter, we do not regard defendants' admissions as sufficient to warrant determination of the issue of whether DeHerde was a de facto officer as a matter of law. A fair reading of those admissions establishes only that DeHerde assumed enumerated duties, formerly performed by Lt. Hayes, following Hayes's illness and retirement. As a consequence, a jury issue exists as to whether, under the appropriate standard, DeHerde functioned as a de facto officer at any point in time after the illness of Hayes.
A further difficulty arises as the result of the judge's failure to clearly instruct the jury that a two-step analysis was required to determine whether DeHerde was a de facto officer. Our review of the jury instructions suggests that the jury could reasonably have understood that it only had to determine that DeHerde assumed the duties of Traffic Unit Supervisor, not that he acted in that capacity. As a consequence, it is possible that the entire damage award, or any portion attributable to *1131 periods when sergeants were assigned to the Traffic Unit, lacked foundation.
Accordingly, we vacate the jury's award in DeHerde's favor and remand his case for a new trial. Although defendants have argued on appeal, as a matter of law, that DeHerde's award should have been limited to back pay, we disagree. We recognize that calculation and payment of pension benefits usually occurs as the result of actions by the Division of Pensions pursuant to the Police and Firemen's Retirement System Act. N.J.S.A. 43:16A-1 to -68. However, in a circumstance such as this in which the conduct of defendants has allegedly deprived DeHerde of benefits that would otherwise have accrued, in the absence of the Division as a party, and in the absence of any evidence that the Division would recalculate pension benefits on the basis of a jury's verdict,[3] we find nothing fundamentally unfair or contrary to law in requiring defendants to pay all damages for which DeHerde demonstrates entitlement.

Thigpen
Plaintiff, Sanford Thigpen, appeals from the dismissal of his claims for non-economic damages arising from alleged malicious prosecution, pursuant to N.J.S.A. 2A:47A-1, and invasion of privacy as the result of his failure to meet the injury threshold of the TCA, N.J.S.A. 59:9-2(d). As previously stated, Thigpen received a $10,000 economic damage award for malicious prosecution that is not a subject of appeal.
Thigpen joined the East Orange Police Department in 1986. In early 2003, when under consideration for a promotion to sergeant, the Department's Internal Affairs Unit prepared a synopsis of Thigpen's disciplinary history and commendations that was submitted to the East Orange Board of Police Commissioners to aid them in making appointments from among eligible candidates. Ultimately, Thigpen was passed over, and two other officers with lower scores, defendants Norman Price and William Garvin, were selected. Thigpen later determined that the synopsis was inaccurate in, among other things, failing to state that he was reinstated after a brief termination in 1986, reflecting minor disciplinary actions that should have been removed because of their age, and improperly characterizing minor infractions as major. Thigpen believed that these errors had cost him a deserved promotion.
Later in 2003, Lieutenant Paul Davis, the head of the Internal Affairs Unit, learned that Garvin, who worked in the Unit, had discussed Thigpen's file with Price, who used this information in a lawsuit filed after his promotion was invalidated. Upon determining that Thigpen had not authorized the disclosure, Garvin was removed from the Unit. However, disciplinary charges filed against Garvin were later dismissed on procedural grounds.[4]
On April 11, 2003, Thigpen was assigned to guard a prisoner, who was handcuffed to his bed and on a respirator, at a local hospital. While ostensibly guarding the man, Thigpen decided to shave himself, claiming he could see the prisoner in the mirror. He refused to stop shaving when requested to do so by nurses. Upon his refusal, Thigpen's superiors were contacted, Thigpen was reassigned, and disciplinary charges were brought, resulting in an initial six-month suspension. Upon appeal, a hearing officer upheld the charges, but reduced Thigpen's suspension to fifteen *1132 days. After further appealing the matter to the Office of Administrative Law, incurring attorney's fees of $7,000, the Department withdrew the charges arising from the shaving incident. Although the Department agreed to reimburse Thigpen for the fifteen day suspension without pay, no reimbursement was made.
At the charge conference held in the matter, the trial judge ruled that Thigpen's claims were covered by the TCA, and that he had failed to meet the Act's injury threshold, thereby barring his recovery for pain and suffering on the malicious prosecution claim, and for emotional distress on the invasion of privacy claim. The judge also barred Thigpen's claim for punitive damages as the result of malicious prosecution, citing the TCA's grant of immunity to public entities as authority. Because Thigpen only sought non-economic damages for invasion of privacy, that claim was dismissed. Thigpen's damages for malicious prosecution were limited to his alleged economic losses. A subsequent motion for a new trial on the barred claims was denied.
N.J.S.A. 2A:47A-1 provides:
Any person who falsely and maliciously and without probable cause makes a complaint, orally or in writing, of unprofessional conduct against a member of any profession requiring a license or other authority to practice such profession, to any court or to any ethics and grievance committee, or to any board or other public body authorized to and having the right to hear such complaint and to act thereon or to recommend action thereon and to take or recommend the taking of disciplinary action against the person complained of, such as disbarment or suspension in the case of an attorney-at-law, or the revocation or suspension of a license of other professional persons, shall be liable for any and all damages suffered and sustained by the member of a profession so complained of, to be recovered in a civil action in the nature of an action at law for malicious prosecution. In any such action, exemplary or punitive damages may be awarded.
The law was passed, in 1956, in response to the Supreme Court's decision in Toft v. Ketchum, 18 N.J. 280, 286-87, 113 A.2d 671 cert. denied, 350 U.S. 887, 76 S.Ct. 141, 100 L.Ed. 782 (1955), holding for public policy reasons that a complainant in a legal ethics matter was immune from a malicious prosecution claim by the attorney who was the subject of the ethics charge. See In re Hearing on Immunity for Ethics Complainants, 96 N.J. 669, 672, 477 A.2d 339 (1984).[5]
On appeal, Thigpen argues that statutory claims and constitutional claims of civil rights violations are not governed by Tort Claims Act procedures, and that the present action should be treated similarly. In support of his argument, Thigpen relies on Fuchilla v. Layman, 109 N.J. 319, 537 A.2d 652, cert. denied sub nom, University of Medicine & Dentistry v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988), which held that the Tort Claims Act does not apply to claims of discrimination under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42 or the Federal Civil Rights Act, 42 *1133 U.S.C.A. § 1983. Fuchilla, supra, at 337-38, 537 A.2d 652. Similarly, the Court has held that the Tort Claims Act is inapplicable to claims instituted pursuant to the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2. See Owens v. Feigin, 194 N.J. 607, 613, 947 A.2d 653 (2008) (observing that the Civil Rights Act's "purpose includes rectifying violations of constitutional rights, the protection of which has never depended on the satisfaction of the TCA's procedural and substantive requirements.").
N.J.S.A. 2A:47A-1 long predated the passage of the TCA in 1972. For that reason, the legislative history of the malicious prosecution statute contains no reference to the TCA. Further, we find no case law that directly addresses the issue of the effect of the TCA on the malicious prosecution statute. Nonetheless, we do not accept Thigpen's argument that the malicious prosecution statute can be analogized to the civil rights legislation that has been found to be beyond the TCA's purview. The civil rights statutes protect broad societal interests. In contrast, as the Legislature has recognized, N.J.S.A. 2A:47A-1 provides an action "for injury to the person" N.J.S.A. 2A:47A-2 that mirrors the concept of "injury" falling within coverage of the TCA. See N.J.S.A. 59:1-3 (broadly defining "injury" to include "injury to a person ... or any other injury that a person may suffer that would be actionable if inflicted by a private person.").
Moreover, by its terms, a statutory claim under N.J.S.A. 2A:47A-1 is "in the nature of an action at law for malicious prosecution" and requires proof of the same "well-established" elements of the "disfavor[ed]" common-law claim. Brien v. Lomazow, 227 N.J.Super. 288, 300, 547 A.2d 318 (App.Div.1988). We thus see no reason to distinguish the statutory claim, which was passed simply to revive a cause of action for a specific type of common-law malicious prosecution previously barred by the Court, from the common law one, which clearly is subject to the TCA's requirements. Van Engelen v. O'Leary, 323 N.J.Super. 141, 732 A.2d 540 (App.Div.) (finding that defendants, a former County Prosecutor and former Chief of Detectives, were entitled to the TCA's immunity, arising from instituting or prosecuting a judicial or administrative proceeding, and thus barring a malicious prosecution action), certif. denied, 162 N.J. 486, 744 A.2d 1208 (1999).
The TCA states, in N.J.S.A. 59:9-2(d):
No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.
And the Court has held that such limitations are applicable to intentional torts. DelaCruz v. Borough of Hillsdale, 183 N.J. 149, 164-65, 870 A.2d 259 (2005).
Further, the TCA precludes an award of punitive damages against a public entity, N.J.S.A. 59:9-2(c), except under civil rights statutes such as the LAD and the Conscientious Employee Protection Act, in furtherance of such statutes' remedial goals. Green v. Jersey City Bd. of Ed., 177 N.J. 434, 828 A.2d 883 (2003).
Thigpen's claim of invasion of privacy against municipal entities is similarly governed by the TCA, and his non-economic damages are similarly barred as the result of his failure to cross the TCA's injury threshold. DelaCruz, supra, 183 N.J. at 164-65, 870 A.2d 259. The municipal entities cannot be held liable for the conduct of Price and Garvin in light of N.J.S.A. 59:2-10, which provides that "[a] public entity is *1134 not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."
The dismissal of Sanford Thigpen's cause of action for invasion of privacy and his claim for non-economic damages arising from his cause of action based upon malicious prosecution is affirmed. The judgment in favor of Francis DeHerde is reversed and the matter is remanded for a new trial as to whether he was the de facto Supervisor of the Traffic Unit.
NOTES
[1] To progress from patrol officer to sergeant, DeHerde would have to place well on a competitive examination and be appointed by the East Orange Board of Police Commissioners. However, there was some testimony given that suggested that DeHerde could have been appointed an acting sergeant while awaiting the State's next administration of the sergeant's examination. DeHerde did not take the sergeant's examination until 1999.
[2] Grimes was Chief from 1999 to 2005.
[3] We note in this regard that full pension contributions would not have been made by Thigpen and his employer.
[4] Garvin and Price were later criminally investigated in an unrelated matter. Price went to prison, and Garvin resigned from the force.
[5] Despite the legislation, the Supreme Court has maintained the position that attorneys cannot bring malicious prosecution actions against complainants to its district ethics committees. In re Hearing on Immunity, supra, 96 N.J. at 678-79, 477 A.2d 339. However, the statute is effective with respect to all other regulated professionals. Grodjesk v. Faghani, 198 N.J.Super. 449, 454, 487 A.2d 759 (App.Div.1985), modified on other grounds, 104 N.J. 89, 514 A.2d 1328 (1986). We decline to address whether Thigpen falls within the statute's purview, since that issue has not been properly raised before us on appeal.